**NYCSPREP, Inc. v Harlem Props., Inc.**

2024 NY Slip Op 33847(U)

October 25, 2024

Supreme Court, New York County

Docket Number: Index No. 651300/2019

Judge: Melissa A. Crane

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. MELISSA A. CRANE**      PART      60M

*Justice*

-------------------------------------------------------------------------X

NYCSPREP, INC.,          INDEX NO.      651300/2019

Plaintiff,

- v -            **DECISION AFTER**
**BENCH TRIAL**

HARLEM PROPERTIES, INC.,HARLEM PROPERTIES, LLC

Defendant.

-------------------------------------------------------------------------X

Melissa A. Crane, J.S.C.:

## PROCEDURAL BACKGROUND

The court on the record at trial, at the close of plaintiff's case, upon defendant's oral

application under CPLR 4401, dismissed the claims in plaintiff's complaint for conversion and

unjust enrichment because they were duplicative (*see* November 27, 2023 Trial Transcript

[NYSCEF Doc. No. 71], pg. 138). The court also dismissed plaintiff's claim for punitive

damages (*id.*, pg. 139; *see also Sire Spirits, LLC v. Beam Suntory, Inc.,* 227 A.D.3d 630, 632 [1st

Dep't 2024] [finding that "[t]he court correctly dismissed plaintiffs' request for punitive

damages" because "[t]he complaint does not allege that defendants' actions were aimed at the

public or showed the requisite moral turpitude"]). The court also dismissed the fifth cause of

action for tortious interference and the sixth cause of action for prima facie tort (November 27,

2023 Trial Tr., pg. 139).

In addition, plaintiff withdrew the eighth cause of action under General Business Law §

349 (*id.,* pg. 141), and plaintiff has abandoned the ninth cause of action. There was no proof

concerning the ninth cause of action for some kind of negligence. Nor did plaintiff argue in

[* 1]

support of this cause of action in post-trial briefing. The court declined defendant's application to dismiss the tenth cause of action for breach of contract/breach of the covenant of good faith and fair dealing. The trial continued on that claim alone.

For the reasons discussed on the record on 11/28/23, this court found for plaintiff NYCSPREP on the issue of liability (November 28, 2023 Trial Tr. [NYSCEF Doc. No. 72], pg. 262-264). Plaintiff is solely owned by Mr. Somas, who was plaintiff's main witness at trial. In sum, plaintiff established that it needed a certificate of occupancy (COO) in order to open a school. Mr. Somas could not obtain a COO without cooperation from the property owner Harlem Properties, Inc and/or Harlem Properties LLC (together, Defendant). The lease between the parties explicitly anticipated opening an educational facility (Ex. 3 Lease, pg. 1 [Bn. 000056]). The lease also contemplated the need for renovations (Ex. 3 Lease Rider, ¶ 46 [Bn. 000075]) and possibly the need for a new COO (*id.*, Bn. 000077).

The evidence showed that defendants stalled for an unreasonably long period of time. It failed to respond to plaintiff about the COO. When, finally, defendant deigned to communicate, it used plaintiff's desperation for the COO to try to extort more favorable lease terms. These terms contradicted the lease that was already in place. Thus, the court found defendant liable because it had obstructed plaintiff's ability to obtain the COO, rendering plaintiff unable to open its educational facility.

No sooner were the words concerning liability out of the court's mouth on 11/28/2023, than defendant Harlem Properties LLC declared bankruptcy (*see* Bankruptcy Order [NYSCEF Doc. 51]). This appeared to be quite a delay tactic, not only because of the suspicious timing, but also because defendants' main asset, their building at 1970 Adam Clayton Powell Boulevard in Manhattan (the Premises), presumably out valued defendants' potential liability. Having

[* 2]    2    2 of 15

accomplished delaying the damages portion of the trial, defendants simply withdrew the bankruptcy petition a few months later. This does not reflect well on defendant's credibility. Nor does defendant's attempt to sell the property while this litigation and the bankruptcy were pending (*see* August 14, 2024 Trial Transcript [NYSCEF Doc. No. 73], pg. 190).

The damages portion of the trial took place on August 14, 2024. The following is the court's assessment regarding damages.

Plaintiff seeks several categories of damages. Some are speculative, others are reliable. The court will analyze each category separately.

## FACTUAL BACKGROUND

Prior to the troubles this case involves, plaintiff leased the third floor at the Premises. At that time, plaintiff derived its revenue from the provision of educational services to assist medical students in preparation for the United States Medical Licensing Exam (*see* plaintiff's direct testimony affidavit [NYSCEF Doc. No. 48], ¶ 1). It also assisted medical students to obtain clinical residency positions (*id.*).

On September 1, 2016, NYCSPREP signed a lease with defendants to rent the first floor and basement at the Premises (November 27, 2023 Trial Tr., pg. 15). Plaintiff's plan was to renovate the space to expand its educational services (*id.*, at 6, 11-12). The original plan appears to have been to offer medical training programs on the first floor and basement (*id.*).

On June 17, 2017, NYCSPREP signed a franchise agreement with SS Learning Systems Switzerland Gmbh (Speak UP) to be their sole franchise in the northeast to teach English as a second language. This business was to operate out of the first floor and basement as well, or in place of, the medical programs. To that end, plaintiff began extensive renovations to convert the space to classrooms (*see* plaintiff's direct testimony affidavit, ¶¶ 4, 15).

3

[* 3]

Converting at least the basement to a school required a change to the COO regardless of the type of school plaintiff intended to operate. This was because the basement was designated for storage use in the existing COO (*id.,* at ¶4).

## DAMAGES

### I.    THE BREACH DATE AND DEFENDANTS' LIABLITY FOR RENT PAID

As the court found defendants liable, a natural question arose about the date from which defendant should have to refund the rent plaintiff paid in vain. Plaintiff commenced paying rent in March 2017. Plaintiff seems to agree it should not recover the rent for initial months where it would have been renovating anyway. Plaintiff therefore contends that it should not be charged for rent starting in June 2017. Defendant advocates for a date over a year later, October 2018, because that is when plaintiff sent the application to change the COO for defendant's signature.

Defendant's date is unreasonable. Although plaintiff's architect may not have sent the final application to change the COO until October 2018, the record reflects that defendant's lack of cooperation dates all the way back to June of 2017. It was during June of 2017 that Yvette D'Angelo essentially ignored plaintiff's requests for assistance with the COO (*see* Ex.15 [Bn. 000299], where, on June 26, 2017, upon reading the existing COO, that defendant finally sent to him and learning that the basement was only for storage, Mr. Somas asks "what do we need to do now": no response from defendants; *id.,* Bn. 000300, on June 27, 2017 plaintiff asks "we need a reevaluation of the occupancy. When can you get that done?": no response).

In September 2017, defendant continued to stonewall plaintiff for the most part. When defendant did respond, it was to project blame on plaintiff for the delay. For example, on September 13, 2017, Mr. Somas writes "We need to get the occupancy certificate changed to operate as an ESL school" (*id.,* Bn. 000353). On September 27, 2017, Mr. Somas writes again:

"I have not heard from you for over 2 weeks now regarding the change in occupancy status to a school…I really cannot understand why it would take so long to respond" (*id.,* Bn. 000355). This time, plaintiff received an evasive response blaming plaintiff for the delay: "I spoke to the owner and the change was to have been done by the company you hired to do the construction…that should have been part of their application to the Department of Buildings" (*id.*).

However, plaintiff's breach date is unreasonable too. This is because, although defendant's lack of cooperation dates from June 2017, plaintiff was still in the middle of renovations and therefore would not have been able to open its business anyway. Moreover, even if defendants had cooperated, obtaining a new COO from the Department of Buildings would not have been immediate. Finally, despite defendant's stonewalling and evasive answers into September 2017, it is difficult to determine that this conduct amounts to a clear breach at that point. It does not appear that plaintiff was as persistent as he could have been at that point in time. The emails in Exhibit 15 reflect a fluid situation where plaintiff dropped, and then again picked up, the issue of changing the COO (*cf. Rosenblum v. Rosenblum*, 214 AD3d 440, 440 [1st Dep't 2023] [taking into account the actual behavior of the parties in determining dissolution date]).

Moreover, even plaintiff testifies that "In October 2017, NYCS's architect **started** the process of obtaining a Certificate of Occupancy. Documents that needed to be signed by Harlem were sent to Harlem" (*see* plaintiff's direct testimony affidavit, ¶ 27 [emphasis added]). Plaintiff then reports from that point, "[f]or approximately twelve months, despite regular, if not daily requests, Harlem failed and refused to coordinate, cooperate, or even communicate with NYCS regarding signing the paperwork to effect and obtain the needed Certificate of Occupancy" (*id.*).

5

[* 5]

Therefore, for plaintiff to ask in its post-trial brief for a breach date of June 2017 contradicts plaintiff's own testimony that it was not until October 2017 that plaintiff even started the process to obtain a COO.

Nevertheless, the evidence does reflect that the defendant strung plaintiff along for almost a year, from October 2017 to August/September 2018. Finally, in October 2018, it became clear what defendant was trying to accomplish. Having placed plaintiff at its mercy because of plaintiff's desperate need for sign off on the new COO application, defendant attempted to extort more lucrative lease terms out of plaintiff. On October 19, 2018, after stalling since June 2017, defendant wrote "We have decided that we will change the C of O for you but we will need the following agreed to:" (*see* Ex. 15 [Bn. 000489]). The following included (1) a much longer lease term, (2) thousands of dollars in additional security or (3) plaintiff being responsible to install a sprinkler system (*id.*).

Given the extensive delay tactics prior to October 2018, defendant's proposed breach date of October 2018 is too late. However, plaintiff's proposed breach date of June 2017 is too early, because it fails to take into account plaintiff's construction schedule, the actual date of plaintiff's new COO application and the difficulty of proof concerning a clear breach any earlier.

Nevertheless, we do have plaintiff's testimony that its architect sent the application to change the COO to defendant in October 2017 (*see* plaintiff's direct testimony affidavit, ¶ 27). We also have plaintiff's testimony, backed up with documentary evidence, that he begged for movement on the COO from defendant from that time forth with no real response until defendant's attempt to extort more favorable lease terms on October 19, 2018. Therefore, a reasonable breach date is the interim date between October 2017 and October 19, 2018. Hence,

[* 6]

6

plaintiff should not have to pay rent from **April 15, 2018.** Unless the court is mistaken, plaintiff

paid rent until December 31, 2018. The rent was $13,500 per month (*see* Ex. 3 Lease; *see also*

plaintiff's direct testimony affidavit, pg. 65 [where plaintiff claims $283,500 in damages for rent

for 21 months which equals $13,500 per month]). Thus, plaintiff's damages for half the month

of April until the end of 2018 amount to **$114,750.00** in rent plaintiff should not have had to pay

due to defendant's breach of contract/breach of the covenant of good faith and fair dealing.

II.     PAYROLL

Plaintiff's expert calculated that NYCSPREP paid $102,743 in payroll or independent

contractor expenses. However, plaintiff has failed to carry its burden with respect to much of the

payroll/independent contractor expenses.

Plaintiff has the burden of proof. Most of the employees for which it seeks to recover

worked on the third floor where plaintiff had an existing business (*see* Ex. 4 Expert Report [Bn.

000866]). Therefore, there is a reasonable presumption, especially given that the first-floor

business was not even open, that employees working on the third floor worked for the existing

third-floor business. Plaintiff gave no breakdown or explanation about why all the employees

should count for the first-floor business. Therefore, plaintiff can only recover for the following

employees who plaintiff's expert described as working on the first floor and only those amounts

listed on Ex 4. These are:

| | |
|---|---|
| Myrna Coombs: | $2,415. |
| Sabrina Curti: | $7,425 |
| Adrina Lima: | $2,505 |
| Toni Musa: | $1,584 |
| Total = | **$13,929.00** |

At trial, and in the post-trial brief, plaintiff argues that its own expert failed to account for

certain employees' W-2s, such that the real number plaintiff spent on payroll is $466,020.

[* 7]

Plaintiff invites the court to make its own calculation based on the W-2s. The court declines this invitation. At bottom, it is not possible to discern from the W-2's whether these employees were working on the first floor or the third floor. Therefore, the presumption is they worked for the existing business, not the business that had not yet started.

Defendant claims that payroll was not damage within the contemplation of the parties. The court disagrees. It is reasonable plaintiff could have had some employees engaged in start-up duties in order to be ready to open the new venture. Defendant ruined that new venture by stonewalling plaintiff on the COO. Defendant could easily have foreseen that funds plaintiff spent on employees engaged in start-up activities would be wasted if defendant stood in the way of the business being able to open. $13,929.00 is not unreasonable to pay employees for start-up activities, like marketing.

III.    RENOVATION COSTS

Defendant entered the lease knowing that plaintiff intended to renovate the first floor and basement to open a school (*see* Ex. 3 Lease, at pg. 1 "Tenant shall use and occupy the demised premises for education and conference facility"). Defendant was also quite aware of plaintiff's renovation work.

Defendant claims that it should not be responsible for plaintiff's construction costs because plaintiff incurred those costs before deciding to operate the medical training and ESL programs that would require state licensure (*see* defendant's post-trial brief [NYSCEF Doc. No. 70], pg.10).

This is irrelevant. The lease contemplated an education and conference facility (Ex 3, pg. 1) and also contemplated a change of the COO (*see* Ex 3 Lease Rider, (viii) [Bn.

[* 8]

**8**

000077]). Indeed, defendant had to know their own existing COO designated the basement for storage only and therefore the basement could not become occupied without a COO change.

Despite the lease language and defendant knowing: (1) plaintiff intended to operate a school and (2) plaintiff needed a change in the COO to do so, defendant stonewalled plaintiff's efforts to open by failing to cooperate in obtaining a COO for over a year. Thus, defendant should have known that it could be liable for plaintiff's renovation costs that were rendered a wasted expense due to defendant's refusal to sign the application for a new COO. As it is undisputed that plaintiff's renovation costs were $165,000, the court holds defendant responsible for all of plaintiff's renovation costs in the amount of **$165,000.00**.

## IV. LOST PROFITS

Plaintiff has provided no relevant case law that supports its entitlement to lost profits or "discretionary income." Further, under New York law, evidence of lost profits from new business ventures is given greater scrutiny because there is no track record upon which to base an estimate (*Schonfeld v. Hilliard*, 218 F3d 164, 172 [2d Cir. 2000]). "[I]n the case of a new business seeking to recover loss of future profits, a stricter standard is imposed because there is no experience from which lost profits may be estimated with reasonable certainty and other methods of evaluation may be too speculative" (*Ashland Mgmt. Inc. v. Janien*, 82 NY2d 395, 404 [1993]).

Plaintiff failed to carry its burden to demonstrate that its new business venture would have turned a profit. The business plaintiff desired to start up on the first floor and basement was to be a school for English as a second language. Plaintiff's existing third floor business was for students taking the MCAT and USMLE exam. Therefore, the third-floor business is not a reasonable comparison. Knowing this, plaintiff's expert did not use the third-floor business as a

9

[* 9]

comparison, but instead used the "yardstick method" (August 14, 2024 Trial Tr., pg. 26). He admirably tried to craft a comparable profit analysis by taking Mr. Somas' estimates on tuition and anticipated enrollment and comparing that to national data for similar schools.

There was nothing in the record to support Mr. Somas' assumptions about the number of students and what they would pay once the business was open. Mr. Somas apparently told Mr. Gottlieb that he had some students registered. However, at trial, Mr. Somas testified that he had no students (November 28, 2023 Trial Tr., pg. 240-244). As a cross check, Mr. Gottlieb used ESL industry-wide data from BizMiner that was based on national statistics. The information from BizMiner was never produced or made part of the report, although the expert report does refer to BizMiner. The BizMiner data derived from all over the country. It did not take into account factors specific to New York, such as higher rent. Nor was there any attempt to analyze Mr. Somas' estimates of the number of students and the tuition they would be willing to pay. Nevertheless, Mr. Gottlieb estimated that the as-yet-to-be business would generate a colossal $1,014,720 revenue for 2018 (August 14, 2024 Trial Tr., pg. 27).

Simply put, the lost profit analysis for this new business heaps speculation on speculation and therefore cannot serve as a basis to award lost profits (*see ADYB Engineered for Life, Inc. v. EDAN Admin. Servs. (Ireland) Ltd.*, 2024 WL 2125431, at *13 [SDNY May 10, 2024] ["projecting profits for a company that had never had any was bound to be guesswork especially where estimates relied on assumptions from plaintiff"]). Because lost profits are not recoverable at all, there is no "discretionary earnings" for Mr. Somas to draw from those profits.

Plaintiff argues in its post-trial memorandum that plaintiff's third-floor business could be used as a measure for the brand-new business on the first floor (plaintiff's post-trial memorandum [NYSCEF Doc. No. 62]). This does not hold up. First, plaintiff's own expert

rejected this comparison. Plaintiff's expert explained the third floor could not serve as a comparison because plaintiff's planned new business would have been entirely different from the third-floor business (*see* August 14, 2024 Trial Tr., pg. 36: "That's an entirely different type of business than the one that's subject to our damage analysis;" *id.*, pg. 37: "It's an entirely different business"). The court declines plaintiff's invitation to use the tax returns from the third-floor business to fashion some sort of lost profits for plaintiff's first floor business.

Moreover, at no point, even after moving out, was plaintiff able to open the business. This is further indication that this business would not have turned a profit.

## V.       MISCELLANEOUS DAMAGES

### A. Franchise Fee

At paragraph 65 of plaintiff's direct testimony, Mr. Somas testified that he paid **$30,000** for a franchise fee for a school that he was unable to open because of defendants' bad faith (*see* plaintiff's direct testimony, ¶ 65). Exhibit 10 shows the proof of the payments for the franchise fee. Because of defendant's bad faith and extortionary conduct, the franchise fee went to waste. Accordingly, plaintiff is entitled to recover the amount it spent for the franchise fee. Defendant's argument that the franchise fee was not tied to a location and therefore should not be recoverable, when defendant stood in plaintiff's way for over a year, rings hollow.

### B. Security Deposit and Rent Advance

It is undisputed that defendant still has not returned plaintiff's security deposit in the amount of **$27,000** (*see* Ex 9). Therefore, defendant must return plaintiff's security deposit. Plaintiff also paid **$13,500** as a rent advance that was never returned (*id.*). This amount must be returned as well.

### C. Remaining Miscellaneous Expenses

11

[* 11]

Paragraph 65 of Plaintiff's direct testimony affidavit lists a litany of other expenses that contain items not already covered in this decision. These are: $5,000 for "Change of Occupancy" that plaintiff later clarified was paid to his architect; $17,000 for "Books"; $20,000 in "training fees"; $24,000 for "Azure Cloud Services"; $60,000 for "Marketing and Website"; $48,000 for "Utilities and Internet"; $50,000 for supplies and janitor; and $10,000 for "State BPSS Fees." These items lack documentary support and are suspiciously round numbers suggesting that they are plaintiff's estimates. Accordingly, plaintiff has failed to carry its burden with respect to these items.

### D. Expert Witness Fees

The Lease provides that "Shall Litigation be instituted between the parties, the prevailing party shall be entitled to <u>legal fees</u>." (Ex 3, ¶ 70 [emphasis added]). Expert witness fees are not legal fees (*see generally* 4B N.Y. Prac., Com. Litig. in New York State Courts § 62:13 [5th ed.], citing *Hulse v Simoes*, 28 Misc 3d 1212(A) [Sup Ct, Nassau County 2010] [holding that defendant was not entitled to expert witness fees, which "are not recoverable absent extraordinary circumstances"], *Alvarado v Dillon*, 67 AD3d 1214, 1216 [3d Dept 2009] ["The fees of expert witnesses are not proper disbursements under any subdivision of CPLR 8301 unless extraordinary circumstances are established."], *Van Patten v Sylvia*, 76 Misc 2d 899, 900 (Sup Ct, Schenectady County 1974] [explaining that CPLR 8301(a)(12), now codified as CPLR 8301(a)(13), "authorizes the court to allow 'reasonable and necessary expenses' but that authority contemplates the court's discretion" and "[a]bsent a showing justifying the exercise of such discretion, 'expert' or 'professional' witnesses are entitled only to the statutory fee for attendance"]). Moreover, plaintiff has provided no authority to support its contention that expert

[* 12]

12

witness fees are included in a contractual agreement which awards one party "legal fees."

Therefore, the court will not award plaintiff the money spent on its expert witness.

### E. Attorneys' Fees

Although plaintiff is not entitled to expert fees, legal fees are recoverable as plaintiff is

the prevailing party. Defendant has not challenged the reasonableness of plaintiff's counsel's

fees. Nor could they, as plaintiff's counsel charged a mere $66,606.00 for the majority of this

case and then only $15,000.00 from May-September 2024, a period that included the damages

portion of the trial. However, bankruptcy counsel's fees are not recoverable in this action as this

case is not the bankruptcy. Accordingly, the court awards **$81,606.00** for plaintiff's reasonable

attorney's fees as the prevailing party.

### F. Pre-judgment Interest

No party has addressed the date from which to run prejudgment interest. As this is a

breach of contract/breach of the covenant of good faith and fair dealing, the court must award

pre-judgment interest (*see Rosenblum v Rosenblum*, 214 AD3d 440, 440 [1st Dept 2023]).

Without any advocacy from the parties, they have waived their arguments as to their preferred

date. As there are several pockets of damages with differing trigger dates, the court runs statutory

interest from the date plaintiff filed its complaint, which is March 4, 2019. However, the award

of attorney's fees is not subject to statutory interest, because plaintiff was not the prevailing party

until the court ruled.

## CONCLUSION

As discussed above, plaintiff is entitled to judgment in the amount of $364,179.00 on its

tenth cause of action ($114,7500 for rent + $13,929 for start-up costs + $165,000 for renovations

+ $30,000 for the franchise fee + $27,000 for the security deposit + $13,500 for the rent advance

[* 13]

13

= $364,179.00). Plaintiff is also entitled to $81,606.00 for its reasonable attorneys' fees as the prevailing party. The remainder of plaintiff's claims are dismissed, withdrawn, or abandoned.

The court has considered the remaining contentions of the parties and finds them unavailing.

Accordingly it is

**ORDERED** that the court renders a verdict in favor of plaintiff on its tenth cause of action; and it is further

**ORDERED** that pursuant to the parties' agreement, the court awards plaintiff its reasonable attorney's fees; and it is further

**ORDERED** that plaintiff's remaining claims are dismissed or withdrawn as set forth in this decision after trial; and it is further

**ORDERED** that the Clerk is directed to enter judgment as follows:

- On plaintiff's tenth cause of action, the Clerk is directed to enter judgment in favor of plaintiff NYCSPREP, INC., and against defendants HARLEM PROPERTIES, INC. and HARLEM PROPERTIES, LLC, jointly and severally, in the amount of $364,179.00, together with prejudgment interest at the statutory rate from March 4, 2019 until the date of this decision after trial, and thereafter at the statutory rate, as calculated by the Clerk, together with costs and disbursements to be taxed by the Clerk upon the submission of an appropriate bill of costs; and

- For plaintiff's reasonable attorneys' fees, the Clerk is directed to enter judgment in favor of plaintiff and against defendants, jointly and severally, in the amount of $81,606.00, with post-judgment interest from the date of this decision after trial at the statutory rate;

And it is further

**ORDERED** that there shall be no motion practice without prior notice to the court; and it is further

**ORDERED** that the Clerk is directed to record the verdict in plaintiff's favor, to enter the

judgment accordingly, and to mark this case disposed.

DATE: **10/25/2024**

_____
MELISSA A. CRANE, JSC

**Check One:**      [x]  **Case Disposed**      [ ]  **Non-Final Disposition**

**Check if Appropriate:**      [x]  **Other (Specify** _____ DECISION AFTER TRIAL _____ **)**

15

[* 15]